**NATIONAL AUTOMOBILE AND CASUALTY INSURANCE CO., a corporation, Plaintiff,**

**v.**

**The MT. PITT CO., a corporation, Defendant.**

**Civ. No. 64–87.**

United States District Court
D. Oregon.

Sept. 24, 1964.

Carl R. Neil, Krause, Lindsay & Nahstoll, Portland, Or., for plaintiff.

Philip B. Lowry, Frohnmayer, Lowry & Deatherage, Medford, Or., for defendant.

KILKENNY, District Judge.

Plaintiff, in this diversity action, demands judgment against defendant on an indemnity agreement. Plaintiff is referred to as National, the defendant as Pitt, Cheney Forest Products as Cheney, and Pitt's foreman as Davis. At all times pertinent to this decision, Pitt was a lessee under Cheney [1] of a lath mill and lim-

---

1. "6. As soon as said lath mill is ready for operation, (The Mt. Pitt Co.) shall have a lease upon said lath mill, a sufficient amount of land surrounding the same for the proper operation thereof, together with the necessary right of way from the Pacific Highway for ingress to and egress from said mill, for a period of ten years from the date thereof upon the following terms and conditions:

"(a) The rental for the first twenty-four months of said lease shall be at the rate of $5.00 per M. board feet for all finished products produced in said lath mill, but said rental for said twenty-four month period shall in no event be less than the sum of $_____, provided, also, that in no event shall the monthly rental be less than the sum of $300.00 for each and every month during said twenty-four month period, which amount shall be paid on or before the 10th day of each month, commencing with the 10th day of the month following the month in which

ited contiguous premises. As part of the lease, Pitt agreed to indemnify Cheney under the provisions set forth in the footnote.[2]

Cheney's sawmill operations completely surrounded the lath mill leased by Pitt. Pitt employed from three to five men in its operation, while Cheney employed approximately forty-eight men. Pitt's operation consisted of removing edgings from waste material collected on Cheney's conveyor belt, enroute from the sawmill to the burner. Suitable edgings were removed from the conveyor and placed on another conveyor belt that ran to Pitt's lath mill. Although there was no definite arrangement between Pitt and Cheney as to the use of the telephone hereinafter mentioned, in fact, Davis consistently used said telephone for the purpose of reporting his activities to Pitt. Davis received permission from Cheney's superintendent to use this phone, which was located in Cheney's scaling shack. On the day in question, Davis was waiting in the scaling shack to complete a telephone call to Pitt's office. Cheney had stored blasting powder in the scaling shack. There were electrical appliances in the shack. An explosion of this powder occurred while Davis was waiting to complete the call. As a result, Davis was severely injured. Pitt and Cheney were both contributors to the Oregon State Industrial Accident Fund at the time of the injury. The Accident Commission paid $16,542.82 to Davis as compensation for his injuries. Subsequent to the explosion, Davis instituted an action against Cheney charging negligence and absolute liability. Before trial, National, Cheney's insurance carrier, settled the action for $19,000.00. From this settlement, $6,-333.33 was paid to the Industrial Accident Commission.

■ I. At the outset, the court must decide if the injury occurred "in connection with" Pitt's operation of the lath mill plant on the Cheney premises. Whether Pitt's activity at the time of the explosion was such as would fall within the meaning of this phrase of the indemnity agreement is a question of fact. Cases such as Alamo Lumber Co. v. Warren Petroleum Corp., 316 F.2d 287 (5th Cir. 1963); Turner Construction Co. v. Belmont Iron Works, 158 F.Supp. 309 (E.D.Pa.1957) and American Agric. Chem. Co. v. Tampa Armature Works, 315 F.2d 856 (5th Cir. 1963) are persuasive, but certainly not decisive. Those cases outline a general pattern to be followed by a trier of the facts. The evidence here produces a clear picture of Davis using this particular phone over a considerable period of time in connection with Pitt's business. The phone was conveniently located for the transaction of such business and Davis had Cheney's permission to use such phone. On the day of the explosion, Davis found it necessary to use the phone in order to comply with Pitt's requirement that he report to its office not

2. "(g) To save Cheney (Forest Products Co.) harmless from all liability of every kind, nature and description in connection with its operation of said lath mill and any other operation conducted by it upon Cheney's premises (it being agreed, however, that (The Mt. Pitt Co's.) operations upon said premises shall be limited to the operation of said lath mill). (The Mt. Pitt Co.) shall forthwith reimburse Cheney (Forest Products Co.) for any and all expenses of any kind and character incurred by it in connection with any claim or action made or filed against it on account of (The Mt. Pitt Co.'s) operations hereunder, including a reasonable attorney's fee and any court costs incurred."

the lease commences, provided, however, that during any period Cheney (Forest Products Co.) closes down its sawmill operation, (The Mt. Pitt Co.) shall not, during such period, be required to make such minimum monthly payment.

"(b) For the balance of the term of said lease, i. e., after the first twenty-four months thereof, the rental shall be at the rate of $5.00 per M. feet for all finished products produced in said lath mill, but said rental shall in no event be less than the sum of $300.00 each month, provided, however, that during any period Cheney (Forest Products Co.) closes down its sawmill operation, (The Mt. Pitt Co.) shall not, during such period, be required to make such minimum monthy payment."

later than 5:00 o'clock. His other work required that he remain at the mill that evening. On all of the facts, I experience no difficulty in finding that Davis was acting within the course and scope of his authority at the time of making this telephone call and that his activities at that time were in connection with Pitt's operation of the lath mill.

II. Next presented is a construction of the indemnity agreement, under the facts, and the liability, if any, of Pitt.

■■■ All of the evidence in the case leads to the conclusion that high explosives were stored in the scaling shack and that the explosion of such was the proximate cause of Davis' injuries. National's argument that Davis must have been smoking and that his act in throwing away a match or a lighted cigarette was the cause of the explosion is highly speculative and not supported by the evidence. On the other hand, Davis' testimony as to what occurred is highly plausible. He testified that he knew he was going to be late in leaving work and that he went to the scaling shack to call in his report. He tried to call, but was met with a busy signal. Again he called, but the line was still busy, and when he hung up the phone, the explosion occurred. He was very forceful in his testimony that he did not know that blasting powder was located in the shack and that he was not smoking at the time of making the telephone call. For that matter, the court was impressed with the testimony of this witness that he never smoked in the scaling shack or in its proximity. The evidence in this case justifies a finding that the explosives were stored in the shack some substantial time before this occurrence. The Oregon Supreme Court, in line with the weight of authority, holds that an explosive such as this, is of the class of elements which one who stores or uses in such a locality, or under such circumstances as to cause likelihood of risk to others, stores or uses it at his peril. Bedell v. Goulter, 199 Or. 344, 351, 261 P.2d 842 (1953). There is no question but that the storage of explosives is an ultrahazardous activity.

Restatement of Torts, Section 520, Comment C. That Cheney was probably liable to Davis on a theory of absolute liability or negligence, or on both theories, is clearly established by the evidence. The storage of such a dangerous substance in an enclosure designed to be occupied and used by humans was, in itself, a negligent act. Furthermore, the storage of the blasting powder and the explosion thereof, proximately causing the injuries to Davis, placed an absolute liability on Cheney. Bedell v. Goulter, supra.

■■■ This factual finding places National's claim squarely within the rule that a contract of indemnity will never be construed to cover losses to the indemnitee caused by his negligence, unless such intention is expressed in clear and unequivocal terms. Southern Pac. Co. v. Layman, 173 Or. 275, 145 P.2d 295 (1944); Ambrose v. Standard Oil Co., 214 F.Supp. 872 (D.Or.1963).

■■■ Southern Pac. Co. v. Morrison-Knudsen Co., 216 Or. 398, 338 P.2d 665 (1959), on which National relies, is clearly distinguishable. First, and to my mind most important, is the fact that we are here dealing with the use by the indemnitee, without the knowledge of the indemnitor, of an ultrahazardous substance. Common sense prevents me from holding that the parties ever intended the indemnity agreement to cover this perilous activity. When I apply the tests used in Morrison-Knudsen and mentioned by the court in Ambrose, I arrive at the same conclusion. In Morrison-Knudsen, the court called attention to the good business judgment of the railroad in requiring protection from its own negligence while serving the bunker because of additional hazards and dangers inherent in the use of a bunker. The hazards were open and known to the indemnitor. The facts in Morrison-Knudsen differ from those here present to such an extent that the decision is of no value. A finding that the indemnity agreement was never intended to permit a recovery on these facts is compelled by any reasonable interpretation of the evidence. A discussion and analysis of other cases

cited by the parties would not change this result.

In the light of my views, as above stat-ed, I do not reach the other issues raised by Pitt. In particular, I decline to pass on its theory that the Workmen's Compensation Law of the state of Oregon prevents the prosecution of this action. The answer to the question involves a substantial, a serious and far reaching question of state law, the answer to which is not entirely clear. Sound judicial discretion dictates the application of the doctrine of judicial abstention.

The admitted facts in the pre-trial order and this opinion shall serve as my findings and conclusions. Additional findings may be proposed by either party.